LEACHCO, INC.
MOTION FOR INJUNCTION PENDING APPEAL
AND BRIEF IN SUPPORT

# Exhibit 1

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF OKLAHOMA

1. **LEACHCO, INC.**,

        Plaintiff,

    *v.*

1. **CONSUMER PRODUCT SAFETY COMMISSION**;

2. **ALEXANDER HOEHN-SARIC**, Chair of the CPSC;

3. **DANA BAIOCCO**, Commissioner of the CPSC;

4. **MARY T. BOYLE**, Commissioner of the CPSC;

5. **PETER A. FELDMAN**, Commissioner of the CPSC;

6. **RICHARD TRUMKA**, Commissioner of the CPSC,

        Defendants.

Case No. **22-CV-232-JAR**

# VERIFIED COMPLAINT
# FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiff Leachco, Inc. is a small, family-owned business in Ada, where it was founded in 1988 by Jamie Leach and her husband Clyde. Leachco designs and makes a variety of products, including an infant lounger called the Podster®. Over 180,000 Podsters® have been sold and, like all of Leachco's products, it has an exemplary safety record. But, because of *two* accidents from 2015 and 2018, the United States Consumer Product Safety Commission suddenly wants to ban the Podster®. But the Commission is not pursuing its claim in a court of law. Instead, the Commission initiated an administrative proceeding. *In re Leachco, Inc.*, CPSC No. 22-1. Through this in-house proceeding, the Commission seeks—*from itself*—a determination that the Podster® presents a "substantial product hazard," defined as a "product defect which . . . creates a substantial risk of injury to the public." 15 U.S.C. § 2064(a)(2). The Commission also seeks—*from itself*—an order imposing damages against Leachco.

This Court's immediate attention is required because the Commission itself and its proceeding suffer from constitutional defects inflicting upon Leachco "here-and-now" injuries that can be remedied only by an Article III court. *Seila Law, LLC v. CFPB*, 140 S. Ct. 2183, 2196 (2020) (cleaned up).

The Commission is unconstitutionally structured for two independent reasons. *First*, the President is precluded from removing Commissioners—principal officers who wield substantial executive power—except for cause. *See Seila Law*, 140 S. Ct. at 2191–92; *Consumers' Research v. CPSC*, --- F.Supp.3d ---, No. 6:21-cv-256-JDK, 2022 WL 1577222, at *7 (E.D. Tex. Mar. 18, 2022) (holding removal protection for CPSC Commissioners is unconstitutional), appeal filed May 18, 2022. *Second*, the administrative adjudicator conducting the Commission's proceeding improperly enjoys at least two levels of for-cause removal protections. *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 495–508 (2010). These restrictions each violate the Separation of Powers, Article II's vesting of the executive power in the President, and the President's duty to "take Care that the laws be faithfully executed." U.S. CONST. art. II, § 3.

The Commission's in-house proceeding suffers from its own constitutional defects: it violates Article III, which vests the judicial power of the United States exclusively in federal courts, not in executive agencies; and it violates Leachco's constitutional rights to due process and a jury trial.

Leachco's "here-and-now" constitutional injuries continue so long as the Commission's in-house proceeding remains pending. Accordingly, Leachco brings this Verified Complaint and asks the Court to issue an order (a) declaring the Commission's structure and proceeding unconstitutional, and (b) temporarily and permanently enjoining the Commission from continuing its claim against Leachco through its in-house proceeding.

## JURISDICTION AND VENUE

1.      This action arises under the Constitution and laws of the United States, and this Court has federal-question jurisdiction under Article III of the Constitution and 28 U.S.C. § 1331. *See Free Enter. Fund*, 561 U.S. at 491 n.2 (recognizing "an implied private right of action directly under the Constitution to challenge

governmental action under . . . separation-of-powers principles"); *Seila Law*, 140 S. Ct. at 2196 (holding that parties alleging injury resulting from actions of an unconstitutionally structured agency have standing to challenge removal restrictions because "when such a provision violates the separation of powers it inflicts a here-and-now injury . . . that can be remedied by a court") (cleaned up).

2. Jurisdiction is also proper under the Due Process Clause of the Fifth Amendment to the United States Constitution.

3. The Court has jurisdiction to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, and 28 U.S.C. § 1361.

4. Venue is proper under 28 U.S.C. § 1391(e).

## THE PARTIES

5. Plaintiff Leachco, Inc. is an Oklahoma corporation, with its principal place of business in Ada, Oklahoma.

6. Defendant Consumer Product Safety Commission (CPSC or Commission) is an executive agency of the United States.

7. Defendant Alexander Hoehn-Saric is a Commissioner and Chair of the CPSC and is sued in his official capacity.

8. Defendant Dana Baiocco is a Commissioner of the CPSC and is sued in her official capacity.

9. Defendant Mary T. Boyle is a Commissioner of the CPSC and is sued in her official capacity.

10. Defendant Peter A. Feldman is a Commissioner of the CPSC and is sued in his official capacity.

11. Defendant Richard Trumka is a Commissioner of the CPSC and is sued in his official capacity.

# BACKGROUND

## *Leachco*

12.     Leachco is a family-owned company in Ada, Oklahoma, founded in 1988 by Jamie Leach and her husband Clyde.

13.     At the time, Clyde was a professional pilot and aerial applicator, and Jamie was employed as a registered nurse.

14.     Jamie is still a registered nurse, and she uses her nursing know-how—and her experience as a mother and grandmother—to design Leachco's products.

15.     Jamie's first design was inspired by a near-accident involving her then-seven-month-old son, who almost slipped out of a restaurant high-chair due to a missing restraint buckle. Jamie quickly fashioned a temporary fix with her purse strap. Within the next few days, Jamie designed a safety wrap using dental floss, tape, and a kitchen hand towel. The "Wiggle Wrap" was born. After parents saw Jamie using it, the Wiggle Wrap gained a lot of attention, and Jamie and Clyde launched Leachco out of their three-bedroom home in May of 1988.

16.     Leachco remained a bare-bones outfit for many years, and both Jamie and Clyde wore many hats—designer, managers, manufacturers, bookkeepers, sales representatives, human-resources managers, custodians, construction managers—just to keep the company alive. They worked hard and pinched every penny.

17.     In 1991, Leachco's accountant told Jamie and Clyde that they needed to close the doors on Leachco. He didn't believe they could stay in business due to the company's debt, lack of sales, and recurring expenses.

18.     But shortly after this meeting, Jamie made a chance, follow-up sales call to Wal-Mart—which ended up being Leachco's big break, as Wal-Mart made a significant order.

19.     Leachco currently has around 40 full-time employees and seven temporary employees.

20.     Jamie has been a prolific designer, and she has done so successfully: Jamie has over 40 patents and scores of trademarks.

21.    Jamie finds great joy and pleasure in her work and in her ability to help, comfort, and support friends, family, and customers.

22.    Jamie's intent and vision have always been to develop products that are useful and safe for her children and grandchildren.

23.    The Leaches themselves have used the Podster® with their own children and grandchildren.

24.    The Leaches deny the Commission's assertion that the Podster® is defective.

25.    Because of the Commission's allegations, large retailers like Amazon, Buy Buy Baby, and Bed, Bath, and Beyond no longer carry the Podster®.

26.    The Commission's allegations have also harmed Leachco's good name and exemplary product-safety record—both of which the Leaches earned over three decades of careful designs, hard work, proper and express warnings, honest dealings, and qualify craftsmanship.

27.    Because of the Commission's public allegations, Leachco's revenues have decreased, and the company was compelled to incur significant legal expenses. Among other measures, Clyde and Jamie are currently forgoing salaries and living off their savings, to ensure Leachco remains solvent and its employees have jobs.

28.    Jamie and Clyde see Leachco as their story of the American way: work hard, innovate, and never give up. They have always modeled these virtues for their children and hope their kids can carry on in the business one day. The Commission's baseless allegations and arbitrary administrative proceeding threaten everything the Leaches have worked so hard for.

### The Commission's Unconstitutional
### Administrative Proceeding Against Leachco

29.    Under the Consumer Product Safety Act, the Commission may, after affording the opportunity for a hearing, determine that a consumer product distributed in commerce presents a "substantial product hazard." 15 U.S.C. § 2064(c), (d), (f), (h). If the Commission so determines, it may, among other things, order the product's manufacturer, distributor, or retailer to: cease distribution of the product; provide

notice to third parties who transport, store, distribute, or otherwise handle the product; provide notice to "appropriate" state and local public-health officials; give public notice of the "defect;" bring the product into "conformity with the requirements of the applicable rule, regulation, standard or ban;" "refund" the purchase price; reimburse other manufacturers, distributors, or retailers for their expenses in connection with carrying out the Commission's order; and submit an action plan, for Commission approval, to comply with the order's requirements. *Id.* § 2064(c), (d), (e).

30.    In February 2022, the Commissioners, by a vote of 3-1, authorized the issuance of an administrative complaint against Leachco under § 2064 alleging that certain lounging pillows manufactured and sold by Leachco—called Podsters®—present substantial product hazards. Attached here as Exhibit 1 is a true and correct copy of the Record of Commission Action (Feb. 9, 2022). *See* https://www.cpsc.gov/s3fs-public/RCA-Vote-to-Issue-Administrative-Complaint-Against-Leachco-Inc.pdf?VersionId=faOQ7PzlN36LojGDXqcLkvqJTn.HIjny.

31.    The Commission filed the administrative complaint in February 2022. *In re Leachco, Inc.*, CPSC Docket No. 22-1. Attached as Exhibit 2 is a true and correct copy of the Commission's Administrative Complaint. *See* https://www.cpsc.gov/s3fs-public/pdfs/recall/lawsuits/abc/001-Complaint--In-the-Matter-of-Leachco-Inc-CPSC-Docket-No-22-1.pdf?VersionId=3WKMODTUGoNJPXYzM_VpsS8a.mtPRT5x.

32.    Through this in-house proceeding, the Commission seeks—*from itself*—a determination that the Podster® presents a substantial product hazard.

33.    Through this in-house proceeding, the Commission seeks—*from itself*—an order compelling Leachco to, among other things, pay damages to purchasers and to third parties who may incur compliance costs arising out of the Commission's order.

34.    In its administrative proceeding, the Commission alleges that since 2009, Leachco has manufactured and sold approximately 180,000 "Podsters®."

35.    Podsters® are products designed and marketed for infant lounging while the infant is awake and an adult is supervising.

36.     A true and accurate picture of a Podster® is shown here:



37.     As the Commission itself alleges in its administrative complaint, the Podster® "is not and has never been advertised by [Leachco] as a sleep product." Ex. 2, ¶ 14.

38.     As the Commission alleges in its administrative complaint, the Podster® "contains warnings that the product should not be used for sleep and that adult supervision is always required." Ex. 2, ¶ 15.

39.     A true and correct copy of Podster® warnings and instructions is shown here:



40.     A true and correct copy of Podster® warnings and instructions is shown here:



41.     As the Commission alleges in its administrative complaint, the Podster® "contains warnings that the product should only be used on the floor, and not in another product, such as a crib, on a bed, table, playpen, counter, or any elevated surface." Ex. 2, ¶ 16.

42.     As the Commission alleges in its administrative complaint, the Podster® "contains warnings that infants should not be placed prone or on their side in the product." Ex. 2, ¶ 17.

43.     As the Commission alleges in its administrative complaint, the Podster® "contains instructions that it should be used for infants not to exceed 16 pounds, and should not be used if an infant can roll over." Ex. 2, ¶ 18.

44.     As the Commission alleges in its administrative complaint, the Podster® "contains warnings and instructions that use of the product in contravention to these warnings could result in serious injury or death." Ex. 2, ¶ 19.

45. Podsters® have always been designed for infant lounging while the infant is awake and an adult is supervising.

46. Podsters® have always been marketed and advertised for infant lounging while the infant is awake and an adult is supervising.

47. According to the CPSC Complaint, there have been two incidents allegedly connected to the more than 180,000 Podsters® that have been sold.

48. The two tragic deaths were not caused by any defect in the Podster®. The two incidents—one more than five-and-a-half years ago, and the other more than three-and-a-half years ago—were caused because of multiple misuses of the Podster® that were not reasonably foreseeable uses of the product and violated multiple express warnings, as well as safe sleep practices.

    a. In one instance, a daycare violated multiple state facility-operating regulations, as well as its own rules, safe-sleep practices, and multiple express warnings on the product when it left an infant with a recent respiratory problem to sleep unsupervised in the product, in a crib, for an extended period of time. The infant was not visible to employees, who failed to check on the infant as required. Additionally, the day care allowed other soft products to be in the crib. Each of these actions (i) contradicted Leachco's express warnings and instructions, (ii) violated the day-care center's operating rules, and (iii) violated state law and regulations. The daycare center's state license was revoked because of this incident.

    b. In the second instance, a 17-day-old infant was placed in the Podster®, and then placed on an adult bed, between the infant's adult parents, along with bedding and pillows, for co-sleeping—contrary to Leachco's express warnings and instructions. Upon information and belief, the parents found the infant in the adult bedding and not on the product.

49. These two isolated incidents followed multiple unsafe practices, uses of the product not intended and directly contrary to multiple express warnings, and they are the only injuries known to have occurred in the vicinity of the more than 180,000 Podsters® sold to date.

50. In light of the above, Commissioner Baiocco, who voted against the is-
suance of the administrative complaint, stated, "Pleading that the product is not mar-
keted for sleep, that parents do not use the product as intended and in direct [sic]
contravention of the warnings, calls into question the legal sufficiency of the Com-
plaint." Ex. 1.

51. Yet the Commission remains intent on pursuing its argument through
a proceeding in which the Commission acts as prosecutor, judge, and jury. *In re
Leachco*, CPSC Docket No. 22-1.

### The Constitution Was Framed to Protect
### Life, Liberty, and Property from Arbitrary Rule

52. During the Revolutionary period, America's Founders developed and
adopted the conception of popular sovereignty—*i.e.*, that the people are the source of
all government power. *See* V ELLIOT'S DEBATES 500 (1787) (Madison) ("The people
were, in fact, the fountain of all power."); *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419,
471–72 (1793) ("[T]he sovereignty of the nation is in the people of the nation," because
the people "are truly the sovereigns of the country."); U.S. Code, Organic Laws, Dec-
laration of Independence (1776) ("We hold these truths to be self-evident, that all men
are created equal, that they are endowed by their Creator with certain unalienable
Rights, that among these are Life, Liberty and the pursuit of Happiness.—That to
secure these rights, Governments are instituted among Men, deriving their *just* pow-
ers from the *consent of the governed*.") (emphasis added).

53. Through the ratification of the United States Constitution, the Ameri-
can people delegated some of their power—as described and delimited in the Consti-
tution—to the federal government.

54. This American system of sovereignty—in which a sovereign people di-
vided power among their governmental agents—amounted to a "revolution in the[]
conception of law, constitutionalism, and politics." Gordon S. Wood, *The Creation of
the American Republic* 383 (1969).

55. Under this system, government officials are "the people's . . . agents."
Wood, *The Creation of the American Republic* 385; *see also* Akhil Reed Amar, *Of*

*Sovereignty and Federalism*, 96 Yale L.J. 1425, 1434 (1987) (observing that "government officials" became "merely agents of principals who had prescribed limits on the agents' power in the founding charter").

56.     Because the American system of popular sovereignty was adopted through a written constitution, the federal government's power is "collected, not from tacit implication, but from the positive grant expressed in the instrument of union." James Wilson, State House Yard Speech (Oct. 6, 1787), *reprinted in* 1 COLLECTED WORKS OF JAMES WILSON 171, 172 (Kermit L. Hall & Mark David Hall eds., Liberty Fund 2011).

57.     In other words, "the legislative, executive and judicial departments are each formed in a separate and independent manner; and [] the ultimate basis of each is the constitution only, within which the limits of which each department can alone justify any act of authority." *Hayburn's Case*, 2 U.S. (2 Dall.) 408, 410 n.* (1792).

58.     The Constitution divided the government's powers not merely, or even primarily, to resolve inter-branch squabbles or ensure efficient government. Indeed, the "doctrine of the separation of powers was adopted by the convention of 1787 not to promote efficiency but to preclude the exercise of arbitrary power." *Myers v. United States*, 272 U.S. 52, 293 (1926) (Brandeis, J., dissenting).

59.     The "ultimate purpose of this separation of powers is to protect the liberty and security of the governed." *Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 272 (1991).

60.     To preserve life, liberty, and the pursuit of happiness, it is indeed necessary to divide governmental powers because the "accumulation of all powers legislative, executive and judiciary in the same hands, whether of one, a few, or many, and whether hereditary, self appointed, or elective, may justly be pronounced the very definition of tyranny." *The Federalist No. 47*, at 324 (Madison) (J. Cooke ed. 1961) (observing that "[n]o political truth is certainly of greater intrinsic value, or is stamped with the authority of more enlightened patrons of liberty, than" that tyranny arises through concentrated power).

61.     The Framers, of course, well understood how concentrated, arbitrary power could deprive Americans of their "unalienable" fundamental rights to life, liberty, and property.

62.     Among the litany of complaints lodged against King George III were the following:

        a.  "He has obstructed the Administration of Justice, by refusing his Assent to Laws for establishing Judiciary powers."

        b.  "He has made Judges dependent on his Will alone, for the tenure of their offices, and the amount and payment of their salaries."

        c.  "He has erected a multitude of New Offices, and sent hither swarms of Officers to harrass our people, and eat out their substance."

        d.  He has "depriv[ed] us in many cases, of the benefits of Trial by Jury."

U.S. Code, Organic Laws, Declaration of Independence (1776).

### The Constitution's
### Structural Protections Against Arbitrary Power

63.     The Constitution vests "[a]ll legislative Powers herein granted" in Congress. U.S. CONST. art. I, § 1.

64.     The Constitution vests all of "[t]he executive Power in [the] President of the United States," who is duty-bound to "take Care that the Laws be faithfully obligated." U.S. CONST. art. II, § 1, cl. 1; § 3. *See Seila Law*, 140 S. Ct. at 2191 ("Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'") (quoting U.S. CONST. art. II, § 1, cl. 1; § 3).

65.     "In light of '[t]he impossibility that one man should be able to perform all the great business of the State,' the Constitution provides for executive officers to 'assist the supreme Magistrate in discharging the duties of his trust.'" *Free Enter. Fund*, 561 U.S. at 483 (quoting 30 Writings of George Washington 334 (J. Fitzpatrick ed. 1939)).

66.     "Since 1789, the Constitution has been understood to empower the President to keep these [executive] officers accountable—by removing them from office, if

necessary." *Free Enter. Fund*, 561 U.S. at 483. Without this removal power, "'the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else.'" *Seila Law*, 140 S. Ct. at 2191 (quoting *Free Enter. Fund*, 561 U.S. at 514).

67.    The Constitution also established a judiciary—independent of the legislative and executive branches.

68.    The Constitution vests "[t]he judicial Power of the United States . . . in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. CONST. art. III, § 1.

69.    To further ensure independent judgment, the Constitution provides that the "Judges, both of the supreme and inferior Courts shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office." U.S. CONST. art. III, § 1.

### The Consumer Product Safety Commission

70.    The Consumer Product Safety Commission is an "independent regulatory commission." 15 U.S.C. § 2053(a).

71.    The CPSC is headed by five Commissioners who are appointed to staggered, seven-year terms by the President, by and with the advice and consent of the Senate. 15 U.S.C. § 2053(a), (b)(1).

72.    No more than three of the five Commissioners shall be affiliated with the same political party. 15 U.S.C. § 2053(c).

73.    The Commission chair is appointed by the President, by and with the advice and consent of the Senate, from among the five Commissioners. 15 U.S.C. § 2053(a).

74.    Under the Appointments Clause, Congress may, by law, vest heads of departments with the power to appoint inferior officers. *See* U.S. CONST. art. II, § 2, cl. 2 ("Congress may by Law vest the Appointment of such inferior Officers, as they think proper, . . . in the Heads of Departments.").

75. The CPSC chair is authorized, subject to the full Commission's approval, to appoint Commission officers such as an Executive Director and a General Counsel. 15 U.S.C. § 2053(g)(1)(A). And the chair may appoint "such other officers and employees (including attorneys) as are necessary in the execution of the Commission's function." *Id*. § 2053(g)(2). The "appointment of any officer (other than a Commissioner) or employee of the Commission shall not be subject, directly or indirectly, to review or approval by any officer or entity within the Executive Office of the President." *Id*. § 2053(g)(4).

76. The Commission is a "'free-standing, self-contained entity in the Executive Branch.'" *Free Enter. Fund*, 561 U.S. at 511 (quoting *Freytag v. Comm'r*, 501 U.S. 868, 915 (1991) (Scalia, J., concurring in part and concurring in judgment)).

77. The Commission is a "department" under the Appointments Clause.

78. CPSC Commissioners are the "head" of the Commission.

79. Each CPSC Commissioner is an officer of the United States.

80. Each CPSC Commissioner is a principal officer of the United States.

81. The President may not remove a CPSC Commissioner except for "neglect of duty or malfeasance in office but for no other cause." 15 U.S.C. § 2053(a).

82. The Commission may "accept gifts and voluntary and uncompensated services," except industry-sponsored travel. *See* 15 U.S.C. §§ 2076(b)(6), 2086.

### *The Commission is Empowered with Substantial Executive Powers— Namely, Regulatory, Investigatory, and Enforcement powers*

83. CPSC Commissioners exercise "significant authority pursuant to the laws of the United States." *Buckley v. Valeo*, 424 U.S. 1, 125–26 (1976) (per curiam).

84. The Commission is authorized to enforce, among other laws, the Consumer Product Safety Act, the Flammable Fabrics Act, the Federal Hazardous Substances Act, the Poison Prevention Packaging Act of 1970, and the Refrigerator Safety Act.

85. The Commission has broad executive powers over consumer products. *See* 15 U.S.C. § 2058 (procedure for consumer-product safety rules).

86.     Thus, the Commission may enact binding "consumer product safety standards." 15 U.S.C. § 2056(a). Its rulemaking authority extends to, among other things, durable-infant or -toddler products (*id*. § 2056a(b)(2)), toys with spherical ends (*id*. § 2056b(b)(1)(C)), and drywall (*id*. § 2056c). The Commission may exempt certain state and local safety standards from preemption. *Id*. §§ 2056b(h), 2075(c).

87.     Under the Act, the Commission may promulgate rules declaring products "banned hazardous product[s]." 15 U.S.C. § 2057. It may also declare substances or mixtures thereof to be "hazardous substance[s]." *Id*. § 1262.

88.     The Commission may enact rules concerning the importation and exportation of consumer products. 15 U.S.C. §§ 2066, 2067.

89.     The Commission also has extensive investigatory powers. Commission agents—for "purposes of implementing [15 U.S.C. ch. 47], or rules or orders prescribed" thereunder—may enter, at reasonable times, any manufacturing factory, warehouse, or establishment, to inspect areas "which may relate to the safety" of consumer products. 15 U.S.C. § 2065(a).

90.     Manufacturers of consumer products must "establish and maintain" records and reports—and provide them to the Commission—as the Commission may, by rule, "reasonably" require to implement 15 U.S.C. ch. 47, or to "determine compliance" with rules or orders prescribed thereunder. 15 U.S.C. § 2065(b). Upon the request of a Commission designee, every consumer-product manufacturer "shall permit" the inspection of "appropriate books, records, and papers relevant to determining" whether the manufacturer "has acted or is acting in compliance with" 15 U.S.C. ch. 47 and related regulations. 15 U.S.C. § 2065(b). Manufacturers, importers, retailers, and distributors of consumer products must identify, with respect to a consumer product, the related manufacturers, importers, retailers, and distributors. *Id*. § 2065(c).

91.     This is not all. Among other things, the Commission "shall have the power" (1) to compel "any person" to submit written, sworn answers and reports to questions "as the Commission may prescribe to carry out a specific regulatory or enforcement function of the Commission;" (2) to administer oaths; (3) to compel the

- 15 -

attendance of witnesses, testimony, and the production of documents and other physical evidence, "relating to the execution of [the Commission's] duties." 15 U.S.C. § 2076(b)(1)–(3), (c).

92.   The Commission may "by rule" compel "any manufacturer of consumer products" (1) "to provide to the Commission such performance and technical data related to performance and safety" as the Commission considers necessary to "carry out the purposes of" 15 U.S.C. ch. 47, and (2) to give notice of the performance and technical data to prospective purchasers, at the time of original purchase, and to the first purchaser of such product for purposes other than resale. 15 U.S.C. § 2076(e).

93.   As noted above, the Commission may, after affording the opportunity for a hearing, determine that a consumer product distributed in commerce presents a "substantial product hazard." 15 U.S.C. § 2064(c), (d), (f), (h). If the Commission so determines, it may, among other things, order the product's manufacturer, distributor, or retailer to: cease distribution of the product; provide notice to third parties who transport, store, distribute, or otherwise handle the product; provide notice to "appropriate" state and local public-health officials; give public notice of the "defect;" bring the product into "conformity with the requirements of the applicable rule, regulation, standard or ban;" "refund" the purchase price; reimburse other manufacturers, distributors, or retailers for their expenses in connection with carrying out the Commission's order; and submit an action plan, for Commission approval, to comply with the order's requirements. *Id*. § 2064(c), (d), (e).

94.   The Commission may initiate "any civil action" to enforce all laws subject to the Commission's jurisdiction (if the Commission makes a written request to the Attorney General for the latter's representation and the Attorney General does not inform the Commission, within 45 days, that he will represent the Commission). 15 U.S.C. § 2076(b)(7)(A).

95.   The Commission is empowered to seek civil penalties up to $100,000 for each violation, and up to $15 million total for a related series of violations, adjusted for inflation. 15 U.S.C. § 2069(a)(1), (a)(3).

96.     The Commission may intervene in civil actions brought by individual persons or States to enforce certain consumer-product laws. 15 U.S.C. § 2073(b)(3).

97.     The Commission is also authorized to seek "[i]njunctive enforcement and seizure" to restrain "any violation of" the act or to restrain "any person from distributing in commerce a product which does not comply with a consumer product safety rule." 15 U.S.C. § 2071(a).

98.     The Commission, with the concurrence of or through the Attorney General, may initiate "any criminal action" to enforce all laws subject to the Commission's jurisdiction and seek up to five years' imprisonment. 15 U.S.C. §§ 2070(a), 2076(b)(7)(B).

99.     Finally, the Commission "may, by one or more of its members or by such agents or agency as it may designate, conduct any hearing or other inquiry necessary or appropriate to its functions anywhere in the United States." 15 U.S.C. § 2076(a). A Commissioner "who participates in such a hearing or other inquiry shall not be disqualified solely by reason of such participation from subsequently participating in a decision of the Commission in the same matter." *Id.*

100.    Commission hearings are conducted by Presiding Officers. 16 C.F.R. §§ 1025.1, 1025.3(i).

101.    Presiding Officers enjoy broad discretion and significant powers.

102.    According to the Commission's regulations, "broad discretion has been vested in the Presiding Officer who will hear a matter being adjudicated to allow him/her to alter time limitations and other procedural aspects of a case, as required by the complexity of the particular matter involved." 16 C.F.R. § 1025.1.

103.    A Presiding Officer "shall have the duty to conduct full, fair, and impartial hearings, to take appropriate action to avoid unnecessary delay in the disposition of proceedings, and to maintain order," and he "shall have all powers necessary to that end," including the powers to: administer oaths and affirmations; compel discovery; rule upon offers of proof; receive relevant, competent, and probative evidence; and consider procedural and other "appropriate" motions. 16 C.F.R. § 1025.42(a)(1)–(3), (a)(6). While the Federal Rules of Evidence generally apply to Commission

- 17 -

hearings, these rules may "be relaxed by the Presiding Officer if the ends of justice will be better served by so doing." *Id.* § 1025.43(a).

104.   Presiding Officers may also, among other things, extend deadlines, allow "appropriate" amendments and supplemental pleadings, decide whether to allow intervening parties, decide whether to certify a class action and issue related orders, consider motions by parties, issue summary decisions and orders, "control" discovery, and issue discovery sanctions. 16 C.F.R. § 1025.13, .15(c), .17(d)–(e), .18(d)–(g), .25, .31(i), .37.

105.   At the end of a Commission hearing, a Presiding Officer issues an Initial Decision, which includes (1) findings upon the material questions of fact and conclusions upon the material issues of law, along with the reasons therefor; and (2) an order. 16 C.F.R. § 1025.51(a)–(c).

106.   A party may appeal an Initial Decision by filing and serving a notice of intention to appeal within 10 days after the Initial Decision is issued. 16 C.F.R. § 1025.53(a).

107.   Separately, the Commission may unilaterally order review of an Initial Decision. 16 C.F.R. § 1025.54.

108.   If no party appeals, and if the Commission does not order review of the Initial Decision, the Initial Decision becomes the Final Decision and Order of the Commission. 16 C.F.R. § 1025.52.

### Leachco's Here-and-Now Constitutional Injuries Continue So Long as the Commission's Proceeding Continues

109.   Structural separation-of-powers violations inflict here-and-now injuries. *See Seila Law*, 140 S. Ct. at 2196 (holding that parties alleging injury resulting from actions of an unconstitutionally structured agency have standing to challenge removal restrictions because "when such a provision violates the separation of powers it inflicts a 'here-and-now' injury . . . that can be remedied by a court") (quoting *Bowsher v. Synar*, 478 U.S. 714, 727 n.5 (1986)).

110.   The Commission's unconstitutional structure has inflicted and continues to inflict a here-and-now injury on Leachco.

111. So long as the Commission's administrative action continues, Leachco will remain subject to an unconstitutional in-house administrative proceeding initiated by an unconstitutionally structured agency and overseen by an ALJ who improperly enjoys multiple levels of for-cause removal protections.

112. Leachco has thus suffered, and continues to suffer, a here-and-now injury that can be remedied by an Article III court.

113. According to the Supreme Court, "whenever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 141 S. Ct. 1761, 1780 (2021); *see also Selia Law*, 140 S. Ct. at 2196 ("In the specific context of the President's removal power, we have found it sufficient that the challenger 'sustain[s] injury' from an executive act that allegedly exceeds the official's authority.") (quoting *Bowsher*, 478 U.S. at 721); *id*. ("Our precedents have long permitted private parties aggrieved by an official's exercise of executive power to challenge the official's authority to wield that power while insulated from removal by the President.") (citations omitted).

114. Without this Court's review, Leachco will be irreparably harmed by being compelled to defend itself before an unconstitutionally structured Commission, in front of a Presiding Officer who is unconstitutionally protected by multiple levels of removal protection, and in a constitutionally deficient proceeding.

115. Congress does not intend to limit judicial jurisdiction "if 'a finding of preclusion could foreclose all meaningful judicial review'; if the suit is 'wholly collateral to a statute's review provisions'; and if the claims are 'outside the agency's expertise.'" *Free Enter. Fund*, 561 U.S. at 489 (quoting *Thunder Basin Coal Co. v. Reich,* 510 U.S. 200, 212–13 (1994) (cleaned up)).

116. Plaintiff Leachco's constitutional claims in this lawsuit are outside the Commission's authority, competence, and expertise. *See Free Enter. Fund*, 561 U.S. at 491 (The plaintiffs' constitutional claims "are instead standard questions of administrative law, which the courts are at no disadvantage in answering.").

117. ALJ Young—the Presiding Officer in the administrative action—lacks authority to hear, consider, or resolve Leachco's constitutional claims alleged in this lawsuit.

118. None of the CPSC Commissioners has authority to hear, consider, or resolve Leachco's constitutional claims alleged in this lawsuit.

119. The Commission lacks authority to hear, consider, or resolve Leachco's constitutional claims alleged in this lawsuit.

## COUNT I

## THE CPSC IS UNCONSTITUTIONALLY STRUCTURED

### (The Commissioners' For-Cause Removal Protection Violates U.S. CONST. art. II, § 2, cl. 2)

120. The preceding paragraphs are incorporated by reference.

121. The CPSC is headed by five Commissioners, who are appointed to staggered, seven-year terms by the President, by and with the advice and consent of the Senate. 15 U.S.C. § 2053(a), (b)(1).

122. CPSC Commissioners are principal officers of the United States.

123. CPSC Commissioners wield extensive and wide-ranging executive powers—including regulatory, investigatory, and enforcement powers—concerning consumer products introduced domestically or internationally into commerce. *See Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) (Even though the activities of administrative agencies "take 'legislative' and 'judicial' forms," "they are exercises of—indeed, under our constitutional structure they *must be* exercises of—the 'executive Power.'") (quoting U.S. CONST. Art. II, § 1, cl. 1).

124. The President may not remove CPSC Commissioners except for "neglect of duty or malfeasance in office but for no other cause." 15 U.S.C. § 2053(a).

125. The Commissioners therefore wield vast executive powers free of direct Presidential control.

126. As "'a general matter,' the Constitution gives the President 'the authority to remove those who assist him in carrying out his duties.'" *Seila Law*, 140 S. Ct. at 2191 (quoting *Free Enter. Fund*, 561 U.S. at 513–14).

127.    The Supreme Court recognizes only two exceptions to this general rule that the President must be able to remove principal officers at will: "one for multi-member expert agencies that do not wield substantial executive power, and one for inferior officers with limited duties and no policymaking or administrative authority." *Seila Law*, 140 S. Ct. at 2199–2200.

128.    Neither exception applies to the Consumer Product Safety Commission.

129.    The CPSC wields substantial executive power.

130.    The CPSC Commissioners are not inferior officers.

131.    The removal restriction in 15 U.S.C. § 2053(a) on the President's removal power violates the Separation of Powers, Article II's vesting of the executive power in the President, and the President's duty to "take Care that the laws be faithfully executed." U.S. Const. art. II, § 3. *See Seila Law*, 140 S. Ct. at 2191–92; *Consumers' Research*, 2022 WL 1577222, at *7 (holding that removal protection for CPSC Commissioners is unconstitutional), appeal filed May 18, 2022.

## COUNT II

## THE CPSC IS UNCONSTITUTIONALLY STRUCTURED

### (The Multilevel Removal Protection for the Presiding Officer Violates U.S. CONST. art. II, § 2, cl. 2)

132.    The preceding paragraphs are incorporated by reference.

133.    The Commission's in-house proceedings are conducted under the Administrative Procedure Act (5 U.S.C. §§ 551–559) and the procedures set forth in 16 C.F.R. Part 1025.

134.    ALJ Young was assigned to the Commission through an interagency agreement for the loan of his services. *See* Ex. 3 (Order Scheduling Prehearing Conference) (noting appointment); https://www.cpsc.gov/s3fs-public/pdfs/recall/lawsuits/abc/010-Prehearing-Conference-Order-In-the-Matter-of-Leachco-Inc--CPSC-Docket-No-22-1.pdf?VersionId=9yTq5ZP_uhFymfqrC8ajJSr6CptGVuXY.

135.    The Commission chair appointed ALJ Young as the Presiding Officer of the Commission's in-house proceeding, *In re Leachco*, CPSC Docket No. 22-1.

136. Mr. Young is an administrative law judge employed by the Federal Mine Safety and Health Review Commission. *See* https://www.fmshrc.gov/about/news/mary-lu-jordan-and-michael-g-young-sworn-commissioners; *see also* https://www.fmshrc.gov/about/aljs.

137. ALJ Young's assignment, removal, and compensation fall under 5 U.S.C. §§ 3105, 3344, 5362, and 7521. *See* 30 U.S.C. § 823(b)(2).

138. ALJ Young is an officer of the United States. *See Lucia v. SEC*, 138 S. Ct. 2044, 2051–55 (2018).

139. ALJ Young, as Presiding Officer of the *In re Leachco* proceeding, has extensive powers—including "all powers necessary to" carry out his "duty to conduct full, fair, and impartial hearings, to take appropriate action to avoid unnecessary delay in the disposition of proceedings, and to maintain order." 16 C.F.R. § 1025.42(a). *See Lucia*, 138 S. Ct. at 2049 ("An ALJ assigned to hear an SEC enforcement action has extensive powers—the 'authority to do all things necessary and appropriate to discharge his or her duties' and ensure a 'fair and orderly' adversarial proceeding.") (quoting 17 C.F.R. §§ 201.111, 200.14(a)).

140. CPSC Commissioners may not be removed except for "neglect of duty or malfeasance in office but for no other cause." 15 U.S.C. § 2053(a).

141. The Commissioners of the Federal Mine Safety and Health Review Commission, which employs ALJ Young, may not be removed except for cause. 30 U.S.C. § 823(b)(1).

142. ALJ Young may not be removed except "for good cause" as determined by the Merit Systems Protection Board. 5 U.S.C. § 7521.

143. Under the Administrative Procedure Act, "[a]n action may be taken against an administrative law judge . . . by the agency in which the administrative law judge is employed only for good cause established and determined by the Merit Systems Protection Board [MSPB] on the record after opportunity for hearing before the Board." 5 U.S.C. § 7521(a). "The actions covered by" the statute includes "removal." *Id.* § 7521(b); *see also* 5 C.F.R. § 930.211(a) ("An agency may remove . . . an

administrative law judge only for good cause established and determined by the Merit System Protection Board.").

144.    To remove an ALJ like the Presiding Officer here, the CPSC must first make a "proposal[]" to the MSPB and file a complaint. 5 C.F.R. § 1201.137.

145.    In the alternative, to remove an ALJ like the Presiding Officer here, his employer the Federal Mine Safety and Health Review Commission must first make a "proposal[]" to the MSPB and file a complaint. 5 C.F.R. § 1201.137.

146.    MSPB has original jurisdiction to hear actions against ALJs. 5 C.F.R. § 1201.2(c); *see* 5 C.F.R. § 930.211(a) (specifying that actions to remove ALJs are heard by the MSPB under 5 C.F.R. part 1201)

147.    MSPB Commissioners do not *themselves* hear the initial removal request filed by an agency. Instead, "[a]n administrative law judge will hear an action brought by an employing agency . . . against a respondent administrative law judge." 5 C.F.R. § 1201.140(a)(1).

148.    Only after the ALJ in the MSPB proceeding issues a ruling may a party file a petition for review with the MSPB. 5 C.F.R. §§ 1201.140(a)(2), .114, .117.

149.    Ultimately, then, the CPSC or, in the alternative, the Federal Mine Safety and Health Review Commission, can do nothing without the MSPB first determining that good cause exists *and* that removal is the proper remedy. *See* 5 C.F.R. § 1201.140(b) (The MSPB "decision . . . will authorize the agency to take a disciplinary action, and will specify the penalty to be imposed, only after a finding of good cause.").

150.    After the MSPB decision, a party may seek review from the U.S. Court of Appeals for the Federal Circuit—an Article III court. 5 C.F.R. § 1201.141; *see also* 5 U.S.C. § 7703.

151.    MSPB Commissioners may be removed by the President only for "inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d).

152.    These removal provisions not only "protect[] [ALJ Young] from removal except for good cause," but they also "withdraw[] from the President any decision on whether that good cause exists. That decision is vested instead in other tenured officers—the [MSPB, CPSC, and/or Federal Mine Safety and Health Review Commis-

sion] Commissioners—none of whom is subject to the President's direct control." *Free Enter. Fund*, 561 U.S. at 495; *see also id.* at 542 (Breyer, J., dissenting) (noting that ALJs "are all executive officers" that are "removable only for good cause established by the" MSPB, whose members are "themselves protected from removal by the President absent good cause.") (cleaned up).

153. The "result is [an ALJ] that is not accountable to the President, and a President who is not responsible" for ALJ Young. *Free Enter. Fund*, 561 U.S. at 495.

154. As the Supreme Court explained,

> The President cannot 'take Care that the Laws be faithfully executed' if he cannot oversee the faithfulness of the officers who execute them. Here the President cannot remove an officer who enjoys more than one level of good-cause protection, even if the President determines that the officer is neglecting his duties or discharging them improperly. That judgment is instead committed to another officer, who may or may not agree with the President's determination, and whom the President cannot remove simply because that officer disagrees with him. This contravenes the President's 'constitutional obligation to ensure the faithful execution of the laws.'

*Free Enter. Fund*, 561 U.S. at 484 (quoting *Morrison v. Olson*, 487 U.S. 654, 693 (1988)).

155. Accordingly, these multilevel for-cause removal protections "'combine to eliminate any meaningful Presidential control over'" ALJ Young. *Free Enter. Fund*, 561 U.S. at 488 (quoting *Free Enter. Fund v. PCAOB*, 537 F.3d 667, 697 (D.C. Cir. 2008) (Kavanaugh, J., dissenting), rev'd in part).

156. This arrangement "is contrary to Article II's vesting of the executive power in the President." *Free Enter. Fund*, 561 U.S. at 496.

157. The CPSC's structure therefore violates the Separation of Powers, Article II, and the President's obligation to take care that the laws be faithfully executed.

## COUNT III
## THE CPSC IS UNCONSTITUTIONALLY STRUCTURED
### (The CPSA's Political-Affiliation Limit Violates U.S. CONST. art. II, § 2, cl. 2)

158. The preceding paragraphs are incorporated by reference.

159.    Under the Appointments Clause, the President has the power, "by and with the Advice and Consent of the Senate," to appoint principal officers of the United States. U.S. CONST. art. II, § 2, cl. 2.

160.    The Constitution, outside the Appointments Clause, places no limitations on whom the President may nominate and appoint as principal officers of the United States.

161.    CPSC Commissioners are principal officers of the United States.

162.    Commissioners of the CPSC are appointed pursuant to 15 U.S.C. § 2053.

163.    Under 15 U.S.C. § 2053(c), "Not more than three of the Commissioners shall be affiliated with the same political party."

164.    The "political party" limitation in Section 2053(c) unconstitutionally limits the President's Appointments Clause power to nominate and appoint, by and with the advice and consent of the Senate, principal officers of the United States.

## COUNT IV

### THE COMMISSION'S IN-HOUSE PROCEEDING IS UNCONSTITUTIONAL

**(The Commission Is Not Vested with the Judicial Power of the United States, and Its In-House Proceeding Therefore Violates U.S. CONST. art. III)**

165.    The preceding paragraphs are incorporated by reference.

166.    The Constitution vests the "judicial Power of the United States in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. CONST. art. III, § 1.

167.    The Constitution does not vest judicial power of the United States in the executive branch.

168.    Through its in-house action, *In re Leachco*, the Commission seeks an administrative order and judgment determining that Leachco's products present a "substantial product hazard."

169.    Through its in-house action, *In re Leachco*, the Commission seeks an administrative order and judgment compelling Leachco to pay damages in the form

of refunds to purchasers and reimbursement costs to third parties arising out of any orders issued from the Commission.

170. The Commission seeks to deprive Leachco of private rights.

171. Before depriving Leachco's private rights, the Commission must follow common-law procedure—most fundamentally, through an Article III court. *See Stern v. Marshall*, 564 U.S. 462, 482–84 (2011).

172. Only courts of law, through the exercise of judicial power, may issue *judgments* and deprive private parties of private rights. *See Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 219 (1995) ("A judicial Power is one to render dispositive judgments.") (cleaned up).

173. The Presiding Officer of the Commission's in-house proceeding is Michael G. Young.

174. Mr. Young is an administrative law judge employed by the Federal Mine Safety and Health Review Commission and appointed as Presiding Officer of *In re Leachco, Inc.*, CPSC Docket No. 22-1.

175. The Consumer Product Safety Commission is not an Article III court.

176. The Consumer Product Safety Commission is not an Article III agency.

177. The Federal Mine Safety and Health Review Commission is not an Article III court.

178. The Federal Mine Safety and Health Review Commission is not an Article III agency.

179. ALJ Young is not an Article III judge.

180. The Commission's in-house proceeding is not heard or overseen by an Article III judge.

181. The Commission's in-house proceeding therefore violates Article III.

## COUNT V

# THE COMMISSION'S IN-HOUSE PROCEEDING IS UNCONSTITUTIONAL

### (The CPSC's In-House Proceeding Violates Leachco's Due Process Rights Under U.S. CONST. amend. V)

182.   The preceding paragraphs are incorporated by reference.

183.   The Fifth Amendment to the United States Constitution provides that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V.

184.   The Due Process of Law Clause guarantees an independent judgment by an independent judge.

185.   The "judicial Power of the United States" is vested exclusively "in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. CONST. art. III, § 1. To help ensure independence, the "Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office." *Id.*

186.   The Constitution does not vest the judicial power of the United States in the Executive Branch.

187.   Through its in-house action, *In re Leachco*, the Commission seeks an administrative order and judgment—from itself—determining that Leachco's products present a "substantial product hazard" and, as a result, that Leachco should pay damages in the form of refunds to purchasers and reimbursement costs to third parties arising out of any orders issued from the Commission.

188.   The Commission seeks to deprive Leachco of private rights.

189.   The government may not deprive any person of private rights except through common-law procedures—most fundamentally, through an Article III court. *See Stern*, 564 U.S. at 482–84.

190.   Only courts of law, through the exercise of judicial power, may issue *judgments* and deprive private parties of private rights.

191.    Before depriving Leachco's private rights, therefore, the Commission must follow common-law procedure and seek an independent judgment from an independent, Article III court.

192.    Mr. Young is an administrative law judge employed by the Federal Mine Safety and Health Review Commission and appointed as Presiding Officer of *In re Leachco, Inc.*, CPSC Docket No. 22-1.

193.    The Consumer Product Safety Commission is not an Article III court.

194.    The Consumer Product Safety Commission is not an Article III agency.

195.    The Presiding Officer of the Commission's in-house proceeding is Michael G. Young.

196.    The Federal Mine Safety and Health Review Commission is not an Article III court.

197.    The Federal Mine Safety and Health Review Commission is not an Article III agency.

198.    ALJ Young is not an Article III judge.

199.    The CPSC's in-house proceeding is not overseen by an independent, Article III judge.

200.    Additionally, the Commission's procedures themselves preclude fair hearings.

201.    The Commission acts as prosecutor, judge, and jury in its administrative proceeding against Leachco.

202.    To the extent the Commission seeks to adopt new, substantive rules or regulations through in-house adjudicatory means, it also acts as a lawmaker.

203.    The CPSC does not afford litigants the same procedural and evidentiary rights as federal courts do. For example, under Fed. R. Civ. P. 30, parties to a federal lawsuit may take up to 10 depositions without leave of court. But in proceedings before the Commission, parties may not take any depositions without "leave of the Presiding Officer" and only "under such terms and conditions as the Presiding Officer may prescribe." 16 C.F.R. § 1025.35(a).

204.    Presiding Officers have more discretion over adjudicative proceedings and the parties than do Article III judges. For instance, while the Federal Rules of Evidence generally apply to Commission hearings, these rules "may be relaxed by the Presiding Officer if the ends of justice will be better served by so doing." 16 C.F.R. § 1025.43(a).

205.    Additionally, while the Commission is generally barred from interfering with adjudicative hearings, *see id.* § 1025.42(d) ("In the performance of adjudicative functions, a Presiding Officer shall not be responsible to or subject to the supervision or direction of any Commissioner . . . ."), the rule is not absolute: "All directions by the Commission to a Presiding Officer concerning any adjudicative proceedings shall appear on and be made a part of the record." *Id.*

206.    Similarly, it is the Commission—not the Presiding Officer or the parties to a proceeding—which decides whether subpoenas should issue to compel testimony or documents. 16 C.F.R. § 1025.38.

207.    Finally, the Commissioners themselves approved the issuance of the administrative complaint in *In re Leachco, Inc.*, CPSC Docket No. 22-1; and the Commission itself will hear an appeal from Presiding Officer's Young's determination. 16 C.F.R. § 1025.53. Indeed, even if no appeal is filed from a Presiding Officer's initial decision, the Commission may unilaterally decide to review. *Id.* § 1025.54.

208.    Similarly, the Commission "may, by one or more of its members or by such agents or agency as it may designate, conduct any hearing or other inquiry necessary or appropriate to its functions anywhere in the United States," but a Commissioner "who participates in such a hearing or other inquiry *shall not be disqualified* solely by reason of such participation from subsequently participating in a decision of the Commission *in the same matter*." 15 U.S.C. § 2076(a) (emphasis added).

209.    The Commission's proceedings thus violate the ancient maxim—protected by the Due Process Clause—*nemo iudex in causa sua* ("no one should be a judge in his own cause"). *See The Federalist No. 10* ("No man is allowed to be a judge in his own cause; because his interest would certainly bias his judgment, and not improbably, corrupt his integrity.") (Madison).

210. The Commission's in-house proceeding, *In re Leachco*, violates the Constitution's Due Process of Law Clause and thus violates Leachco's due process rights.

# COUNT VI

## THE COMMISSION'S IN-HOUSE PROCEEDING IS UNCONSTITUTIONAL

### (The CPSC's In-House Proceeding Violates Leachco's Right to a Jury under U.S. CONST. amend. VII)

211. The preceding paragraphs are incorporated by reference.

212. The Seventh Amendment to the Constitution provides: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. CONST. amend. VII.

213. Claims analogous to common law claims that existed at the time of the Seventh Amendment's ratification require a jury. *Curtis v. Loether*, 415 U.S. 189, 194 (1974).

214. Claims that seek legal remedies require a jury. *Tull v. United States*, 481 U.S. 412, 418–22 (1987).

215. Accordingly, it is "settled law" "that the Seventh Amendment jury guarantee extends to statutory claims unknown to the common law, so long as the claims can be said to 'sound basically in tort,' and seek legal relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 709 (1999) (cleaned up).

216. In its in-house administrative action, the Commission alleges that the Podster® presents a "substantial product hazard."

217. The Commission's claim is essentially a product-liability claim sounding in traditional tort law; that is, the Commission's claim sounds basically in tort. *See City of Monterey*, 526 U.S. at 729 (Scalia, J., concurring) (noting "[c]ommon-law tort actions" implicate the Seventh Amendment).

218. The Commission also seeks legal damages. It seeks an order compelling Leachco to pay damages to Podster® buyers and to reimburse third parties, such as retailers, who may incur costs arising out of the Commission's order.

219.    Accordingly, Leachco is entitled to a jury trial in connection with the Commission's claim that the Podster® presents a substantial product hazard.

220.    The Commission's failure to afford Leachco a jury trial violates Leachco's Seventh Amendment right to a jury.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff Leachco, Inc. prays for relief as follows:

1.    An order declaring that, because the President may not remove Commissioners from office except for cause, the Commission's structure violates Article II of the Constitution.

2.    An order declaring that, because the Presiding Officer of Commission hearings enjoys multilevel removal protections, the Commission's structure violates Article II of the Constitution.

3.    An order declaring that, because the Consumer Product Safety Act requires that three of the five Commissioners shall not be affiliated with the same political party, the Commission's structure violates Article II of the Constitution.

4.    An order declaring that, because the judicial power of the United States is vested solely in the judicial branch, the Commission's proceedings pursuant to 15 U.S.C. § 2064 violate Article III of the Constitution.

5.    An order declaring that the Commission's proceedings violate the Due Process Clause of the Fifth Amendment to the Constitution.

6.    An order declaring that the Commission's proceedings violate the Seventh Amendment to the Constitution.

7.    An order striking the removal restriction in 15 U.S.C. § 2053(a).

8.    An order striking the removal restriction in 5 U.S.C. § 7521, at least when an administrative law judge is employed by or appointed to an executive agency whose head or heads are themselves protected from removal except for cause.

9.    A preliminary and permanent injunction enjoining the Commission from continuing its administrative proceeding in *In re Leachco, Inc.*, CPSC Docket No. 22-1.

10. An award of reasonable attorney fees and costs, pursuant to 42 U.S.C. § 1988 or any other applicable authority.

11. All other relief the Court deems just and proper.

Date: August 17, 2022

Respectfully submitted,

_/s/ Kurt M. Rupert_

OLIVER J. DUNFORD
  Florida Bar No. 1017791*
Pacific Legal Foundation
4440 PGA Blvd., Suite 307
Palm Beach Gardens, FL 33410
916.503.9060
odunford@pacificlegal.org

John F. Kerkhoff
  Ohio Bar No. 0097134*
Frank Garrison
  Indiana Bar No. 34024-49*
Pacific Legal Foundation
3100 Clarendon Boulevard, Suite 610
Arlington, VA 22201
202.888.6881
jkerkhoff@pacificlegal.org
fgarrison@pacificlegal.org

*Pro Hac Vice Motion to be filed*

KURT M. RUPERT
  OBA No. 11982
Hartzog Conger Cason
201 Robert S. Kerr Ave., Suite 1600
Oklahoma City, OK 73102
405.235.7000
krupert@hartzoglaw.com

*Attorneys for Plaintiff Leachco, Inc.*

# DECLARATION

I, JAMIE LEACH, hereby declare as follows:

My husband Clyde Leach and I founded Leachco, Inc., the plaintiff in this action.

I have read the Verified Complaint for Injunctive and Declaratory Relief and know its contents. The facts alleged in this matter are within my own personal knowledge, and I know these facts to be true, except for matters stated on information and belief, and I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. This Declaration was executed this 16th day of August, 2022, in Ada, Oklahoma.

JAMIE LEACH



United States
**Consumer Product Safety Commission**
cpsc.gov | info@cpsc.gov | 800.638.2772

Record of Commission Action
Commissioners Voting by Ballot*

Commissioners Voting:      Chair Alexander D. Hoehn-Saric
                                 Commissioner Dana Baiocco
                                 Commissioner Peter A. Feldman
                                 Commissioner Richard Trumka Jr.

<u>ITEM</u>:

Vote to Issue Administrative Complaint Against Leachco, Inc.
(Briefing package dated February 8, 2022, OS No. 0111)

<u>DECISION</u>:

The Commission voted (3-1) to authorize issuance of a Complaint, attachment B of the briefing package, against Leachco, Inc., seeking mandatory remedies under section 15(c) and (d) of the Consumer Product Safety Act ("CPSA"), for certain infant products manufactured by Leachco. Included in the complaint are products alleged to present a substantial product hazard: the Podster, Podster Plush, Bummzie and Podster Playtime infant loungers ("Subject Products"). The CPSA defines a substantial product hazard at 15 U.S.C. § 2064(a)(2).

Chair Hoehn-Saric, Commissioners Feldman and Trumka voted to authorize issuance of the Complaint.  Commissioners Feldman and Trumka filed statements with their votes.

Commissioner Baiocco voted to take other action as follows:

> "File the Complaint once staff has appropriate data to support the action.   Pleading that the product is not marketed for sleep, that parents do not use the product as intended and in direction contravention of the warnings, calls into question the legal sufficiency of the Complaint."

For the Commission:

ALBERTA MILLS

Digitally signed by ALBERTA MILLS
Date: 2022.02.09 15:22:01 -05'00'

Alberta Mills
Secretary

**U.S. Consumer Product
Safety Commission**
4330 East–West Highway
Bethesda, MD 20814

**National Product Testing
& Evaluation Center**
5 Research Place
Rockville, MD 20850



**United States**
**Consumer Product Safety Commission**
cpsc.gov | info@cpsc.gov | 800.638.2772

*Ballot vote due February 9, 2022, at 12:00p.m.

**Attachments:**
Statement by Commissioner Feldman
Statement by Commissioner Trumka

**U.S. Consumer Product**
**Safety Commission**
4330 East–West Highway
Bethesda, MD 20814

**National Product Testing**
**& Evaluation Center**
5 Research Place
Rockville, MD 20850



UNITED STATES
**CONSUMER PRODUCT SAFETY COMMISSION**
4330 EAST WEST HIGHWAY
BETHESDA, MD 20814

**COMMISSIONER PETER A. FELDMAN**

### STATEMENT OF COMMISSIONER PETER A. FELDMAN
### ON VOTE TO ISSUE ADMINISTRATIVE COMPLAINT AGAINST LEACHO, INC.
### FEBRUARY 9, 2022

Today, the United States Consumer Product Safety Commission (CPSC) voted to issue an administrative complaint in a case where the Commission has reason to believe that the product at issue presents a substantial product hazard. This complaint follows the Commission's issuance of a safety warning about the product and a Health and Safety Finding to shorten the notice period required under our statute.

For too long, CPSC has not used all of the tools available to it when dealing with product safety enforcement matters. The Consumer Product Safety Act enables the Commission to provide unilateral warnings and also to litigate mandatory product recalls. Consumers deserve transparency about known product hazards. Consumers also deserve products that are safe. Companies deserve an opportunity to defend themselves in court.

I have long advocated that the Commission use its full complement of resources to protect American consumers. In my view, if a matter is serious enough for the Commission to issue a Health and Safety Finding to truncate the 6(b) process, it may be necessary to pair such public warnings with administrative litigation, as we have done here.



UNITED STATES
**CONSUMER PRODUCT SAFETY COMMISSION**
4330 EAST WEST HIGHWAY
BETHESDA, MD 20814

**COMMISSIONER RICH TRUMKA JR.**

**STATEMENT OF COMMISSIONER RICH TRUMKA JR. ON APPROVAL OF
ADMINISTRATIVE SUIT AGAINST LEACHCO, INC., MAKER OF THE PODSTER
AND BUMMZIE INFANT LOUNGERS**

**February 9, 2022**

Today, the Commission voted in favor of agency staff suing Leachco to force a recall of its Podster and Bummzie infant loungers.  There is a reasonable basis to believe that CPSC staff can prove that the loungers present a substantial product hazard.

Today's suit should be a signal that this Commission is serious about protecting consumers.  When companies refuse to recall products deemed deadly by CPSC staff, they should expect an administrative complaint to quickly follow.

UNITED STATES OF AMERICA
CONSUMER PRODUCT SAFETY COMMISSION

|  |  |  |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| | ) | |
| LEACHCO, INC. | ) | CPSC DOCKET NO. 22-1 |
| | ) | |
| | ) | |
| | ) | |
| Respondent. | ) | |

## **COMPLAINT**

### **Nature of the Proceedings**

1.     This is an administrative enforcement proceeding pursuant to Section 15 of the

Consumer Product Safety Act ("CPSA"), as amended, 15 U.S.C. § 2064, for public notification

and remedial action to protect the public from the substantial risks of injury presented by various

models of infant lounging pillows ("Podsters") which were manufactured and distributed by

Leachco, Inc. ("Respondent").

2.     This proceeding is governed by the Rules of Practice for Adjudicative

Proceedings before the Consumer Product Safety Commission (the "Commission"), 16 C.F.R.

Part 1025.

### **Jurisdiction**

3.     This proceeding is instituted pursuant to the authority contained in Sections 15(c),

(d), and (f) of the CPSA, 15 U.S.C. § 2064(c), (d), and (f).

### **Parties**

4.     Complaint Counsel consists of attorneys in the Division of Enforcement and

Litigation within the Office of Compliance and Field Operations representing the staff of the

Commission. 16 C.F.R. § 1025.3(d). The Commission is an independent federal regulatory agency established pursuant to Section 4 of the CPSA. 15 U.S.C. § 2053.

5.     Respondent is an Oklahoma corporation with its principal place of business located at 130 E. 10th Street, Ada, Oklahoma.

6.     Upon information and belief, Respondent is a "manufacturer" and/or "distributor" of a "consumer product" that is "distribute[d] in commerce," as those terms are defined in Sections 3(a)(5), (7), (8), and (11) of the CPSA, 15 U.S.C. § 2052(a)(5), (7), (8), and (11).

### The Podsters

7.     The Podsters consist of various models of infant lounging pillows that were manufactured and/or distributed in U.S. commerce and offered for sale to consumers for their personal use in or around a permanent or temporary household or residence, school, in recreation, or otherwise.

8.     The Podsters are manufactured at Respondent's facilities in Ada, Oklahoma.

9.     Upon information and belief, the Podsters include, but are not limited to, the following models: Podster, Podster Plush, Bummzie, and Podster Playtime.

10.    Upon information and belief, approximately 180,000 Podsters have been manufactured and distributed in U.S. commerce since 2009. The Podster and Podster Plush models have been sold from 2009 to present; the Bummzie was sold exclusively at Walmart from 2010 to 2018; and the Podster Playtime was sold from 2014 to 2017.

11.    Upon information and belief, the retail price for the Podsters ranges from approximately $49 and $89.

12.    The Podsters are sold at various retail chains including, but not limited to, Amazon.com, Bed Bath and Beyond, Buy Buy Baby, Kohls, Macy's, Toys R Us/Babies R Us,

2

and Walmart.

13.     The Podster is a product marketed for caregivers to use for infant lounging and to "provide[] a warm and cozy caress for infants." It was designed to permit a caregiver to keep an infant in a safe environment, allowing for hands-free supervision.

14.     The Podster is not and has never been advertised by Respondent as a sleep product.

15.     The Podster contains warnings that the product should not be used for sleep and that adult supervision is always required.

16.     The Podster contains warnings that the product should only be used on the floor, and not in another product, such as a crib, on a bed, table, playpen, counter, or any elevated surface.

17.     The Podster contains warnings that infants should not be placed prone or on their side in the product.

18.     The Podster contains instructions that it should be used for infants not to exceed 16 pounds, and should not be used if an infant can roll over.

19.     The Podster contains warnings and instructions that use of the product in contravention to these warnings could result in serious injury or death.

### The Podsters' Defects Create a Suffocation Hazard

20.     Despite the warnings and instructions, it is foreseeable that caregivers will use the Podster without supervision. It is also foreseeable that caregivers will use the Podster for infant sleep.

    a.  The Podsters are marketed for use with infants, and caregivers may trust that the products are safe places to leave infants. Because the Podsters appear simple to use, are likely to be used frequently, and do not appear dangerous, it

3

is foreseeable that some caregivers may disregard or not fully read the Podsters' warnings.

b.  If an infant falls asleep in the Podster, a caregiver may choose not to disturb the infant and may leave the infant asleep in the product.

c.  Caregivers facing difficulties in getting their infant to sleep may choose to use the Podster for that purpose if the Podster appears to help with sleep or if the infant appears to be comfortable in the Podster, even if the caregiver is aware of the contrary product warnings.

d.  Caregivers with an infant who are traveling or who are dealing with significant financial hardship may be more likely to allow an infant to sleep in the Podster, as they may not have a crib or safe infant sleep product readily available.

e.  If an infant falls asleep in the Podster, it is foreseeable that the caregiver may intentionally sleep while the infant is asleep, may accidentally fall asleep while the infant is asleep, may use the time that the infant is asleep to catch up on work or chores, or otherwise may leave the infant unsupervised.

21.  Unsupervised infants can roll or move on the Podster into a position where their nose and mouth are obstructed by the Podster.

22.  Unsupervised infants can roll or move off the Podster into a position where their nose and mouth are obstructed by another object, such as soft bedding.

23.  Despite warnings and instructions, some caregivers may not place infants on their backs in the Podster and may place infants in positions where their nose and mouth may be obstructed by the Podster.

24.  The Podster is defective because it can cause airflow obstruction if an unsupervised infant rolls, moves, or is placed in a position where the infant's nose and mouth

are obstructed by the Podster.

25.     The Podster is defective because it is constructed of thick, soft padding that has a concave shape which can envelop an infant's face and cause airflow obstruction if an unsupervised infant rolls, moves, or is placed in a position where the infant's nose and mouth are obstructed by the Podster.

26.     The Podster is defective because it lacks rigid underlying components, which can impede the ability of an infant to self-rescue in the event that the infant rolls, moves, or is placed in a position where the infant's nose and mouth are obstructed by the Podster.

27.     The Podster is defective because it facilitates an infant's movement on the Podster, enhancing the risk that the infant's nose and mouth will be obstructed by the Podster.

28.     The Podster is defective because it facilitates an infant's movement off the Podster, enhancing the risk that the infant's nose and mouth will be obstructed by another object in the infant's environment, such as soft bedding.

29.     The design of the Podster allows infants to bend their knees and push off the raised edges of the Podster with their feet, allowing an infant to roll or move on or off the Podster.

30.     The Podster may allow an infant to roll, even if the infant is not able to roll on a flat surface, such as in a crib or bassinet.

31.     The Podster's design also can lead to unsafe bedsharing where the infant sleeps in an adult bed with one or more adult caregivers.

32.     The Podster may be attractive to caregivers who wish to bedshare with an infant because it is soft and portable, and caregivers may believe that the product's high sides will act as a sufficient barrier between the adult and the infant to keep the infant secure in the

5

Podster.

33.    Bedsharing with an infant in a Podster can result in an infant moving into a compromised position within the Podster and suffocating, or moving outside the Podster and suffocating on another person or object, such as soft bedding or the adult bed.

34.    If an infant rolls, moves, or is placed in a position where the infant's nose and mouth are obstructed by the Podster or another object, such as soft bedding, the infant can suffocate and die in three to 10 minutes.

**Fatal Incidents Caused by the Podsters**

35.    The Podster's defects have led to the deaths of at least two infants.

36.    Upon information and belief, on or about December 16, 2015, a 4-month-old infant suffocated after being placed face-up or on their side in the Podster in a crib. The infant was found face-down on the Podster and later died of complications from asphyxia.

37.    Upon information and belief, on or about January 27, 2018, a 17-day-old infant suffocated after being placed face up in the Podster on an adult bed between two caregivers. Upon information and belief, the infant had moved off the Podster onto the adult bed after one of the caregivers rolled onto the Podster and infant.

**The Substantial Risk of Injury Posed by the Podsters**

38.    It is foreseeable that caregivers will use the Podster for infant sleep, despite the instructions and warnings. It is also foreseeable that caregivers will use the Podster without supervision.

39.    It is foreseeable that some caregivers will not place infants on their backs in the Podster.

40.    It is foreseeable that caregivers will place infants in Podsters and use the Podster for bedsharing in an adult bed.

41.    If an infant rolls, moves, or is placed in a position where the infant's nose and

6

mouth are obstructed by the Podster itself or by another object or person with whom the infant is bedsharing, the infant may not be able to self-rescue and can suffocate within minutes.

42.     Upon information and belief, at least two infants, members of a vulnerable population, have suffocated and died after being placed in the Podster for unsupervised sleep.

## Legal Authority Under the CPSA

43.     Under the CPSA, the Commission may order a firm to provide notice to the public and take remedial action if the Commission determines that a product "presents a substantial product hazard." 15 U.S.C. § 2064(c) and (d).

44.     Under CPSA Section 15(a)(2), a "substantial product hazard" is "a product defect which (because of the pattern of defect, the number of defective products distributed in commerce, the severity of the risk, or otherwise) creates a substantial risk of injury to the public." 15 U.S.C. § 2064(a)(2).

45.     A product may contain a design defect even if it is manufactured exactly in accordance with its design and specifications if the design presents a risk of injury to the public. *See* 16 C.F.R. § 1115.4.

46.     A defect can also occur in a product's contents, construction, finish, packaging, warnings, or instructions.

47.     In assessing whether a product contains a defect, the Commission may consider a consumer's foreseeable use or misuse of the product. *See* 16 C.F.R. § 1115.4.

## Count I

### The Podsters Are a Substantial Product Hazard Because They Contain Defects That Create a Substantial Risk of Injury to the Public

48.     Paragraphs 1 through 47 are hereby realleged and incorporated by reference as if fully set forth herein.

49.     The Podsters are consumer products.

50. The Podsters contain defects because it is foreseeable that caregivers will use the product for infant sleep and it is foreseeable that caregivers will leave infants unattended in the product, and:

    a. The Podster can cause airflow obstruction leading to suffocation if an infant rolls, moves, or is placed in a position where their nose and mouth are obstructed by the Podster;

    b. The design of the Podster prevents infants from self-rescuing once their nose and mouth are obstructed by the Podster;

    c. The design of the Podster facilitates infant movement on the Podster, which can result in an infant's nose and mouth becoming obstructed by the Podster;

    d. The design of the Podster facilitates movement off the Podster, which can result in an infant's nose and mouth being obstructed by another object in the infant's environment, such as soft bedding; and

    e. The design of the Podster may lead to it being used for bedsharing, which can facilitate an infant's rolling off the product onto an adult bed, leading to the infant's nose and mouth being obstructed by another object or an individual sleeping in the bed.

51. These defects separately, and in combination, create a substantial risk of injury to infants because of the pattern of defect, the number of defective products distributed in commerce, the severity of the risk, or otherwise.

52. Therefore, the Podsters present a substantial product hazard within the meaning of Section 15(a)(2) of the CPSA, 15 U.S.C. § 2064(a)(2).

## **RELIEF SOUGHT**

WHEREFORE, in the public interest, Complaint Counsel requests that the Commission:

A.      Determine that the Podsters present a "substantial product hazard" within the meaning of Section 15(a)(2) of the CPSA, 15 U.S.C. § 2064(a)(2).

B.      Determine that extensive and effective public notification under Section 15(c) of the CPSA, 15 U.S.C. § 2064(c), is required to adequately protect the public from the substantial product hazard presented by the Podsters, and order Respondent under Section 15(c) of the CPSA, 15 U.S.C. § 2064(c), to:

(1)      Notify all persons who sell or distribute the Podsters, or to whom such Podsters have been sold or distributed, to immediately cease distribution of the Podsters;

(2)      Notify appropriate state and local public health officials;

(3)      Give prompt public notice of the defect in the Podsters, including the incidents and injuries associated with the use of the Podsters, including posting clear and conspicuous notice on Respondent's website, and providing notice to any third-party website on which Respondent has a presence, and provide further announcements in languages other than English and on radio, television, and social media;

(4)      Mail and email notice to each distributor and retailer, of the Podsters; and

(5)      Mail and email notice to every person to whom the Podsters were delivered or sold.

C.      Determine that action under Section 15(d) of the CPSA, 15 U.S.C. § 2064(d), is in the public interest and additionally order Respondent to:

(1)      Refund the purchase price of the Podster;

(2)      Reimburse distributors, retailers, and any other third parties

for expenses in connection with carrying out any Commission Order issued in this matter, as provided by Section 15(e)(2) of the CPSA, 15 U.S.C. § 2064(e)(2);

(3)     Submit a plan satisfactory to the Commission, within ten (10) days of service of the Final Order, directing that actions specified in Paragraphs B(1) through (5), above and C(1) through (2) be taken in a timely manner;

(4)     Submit monthly reports, to the Commission, documenting the progress of the corrective action program ordered pursuant to this matter;

(5)     For a period of five (5) years after issuance of the Final Order in this matter, keep records of its actions taken to comply with Paragraphs B(1) through (5), C(1) through (4), above, and supply these records to the Commission for the purpose of monitoring compliance with the Final Order; and

(6)     For a period of five (5) years after issuance of the Final Order in this matter, notify the Commission at least sixty (60) days prior to any change in its business (such as incorporation, dissolution, assignment, sale, or petition for bankruptcy) that results in, or is intended to result in, the emergence of a successor corporation, going out of business, or any other change that might affect compliance obligations under a Final Order issued by the Commission in this matter.

///

///

///

///

///

///

///

D.      Order that Respondent take other and further actions as the Commission deems

necessary to protect the public health and safety and to comply with the CPSA.

ISSUED BY ORDER OF THE COMMISSION:

ALBERTA MILLS   Digitally signed by ALBERTA MILLS
                Date: 2022.02.09 15:32:24 -05'00'

Dated this 9th day of February 2022

ROBERT KAYE   Digitally signed by ROBERT
              KAYE Date: 2022.02.09 16:03:33
              -05'00'

_____

By: Robert Kaye
Assistant Executive Director
Office of Compliance and Field Operations
(301) 504-6960


Mary B. Murphy, Director, Division of Enforcement and Litigation
Leah Ippolito, Supervisory Attorney
Brett Ruff, Trial Attorney
Rosalee Thomas, Trial Attorney


Complaint Counsel
Office of Compliance and Field Operations
U.S. Consumer Product Safety Commission
Bethesda, MD 20814
Tel: (301) 504-7809

UNITED STATES OF AMERICA
CONSUMER PRODUCT SAFETY COMMISSION

| | | |
|---|---|---|
| | ) | |
| In the Matter of | ) | |
| | ) | |
| | ) | |
| LEACHCO, INC. | ) | CPSC DOCKET NO. 22-1 |
| | ) | |
| | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## LIST AND SUMMARY OF DOCUMENTARY EVIDENCE

Pursuant to 16 C.F.R. § 1025.11(b)(3) of the Commission's Rules of Practice for

Adjudicative Proceedings, the following is a list and summary of documentary evidence

supporting the charges in this matter. Complaint Counsel reserves the right to offer additional or

different evidence during the course of the proceedings, or to withhold evidence on the basis of

any applicable legal privileges.

1. Claims, complaints, records, reports, CPSC's In-Depth Investigations, and lawsuits

   concerning incidents or injuries involving infant lounging pillows manufactured

   and distributed by Respondent Leachco, Inc. ("Podsters").

2. CPSC Product Safety Assessments.

3. Correspondence between Respondent and CPSC staff related to the Podsters.

4. Documents and information related to the Podsters, including notices issued

   regarding the Podsters and similar products.

Dated this 9th day of February 2022

*Mary B. Murphy*

———————————————————————

Mary B. Murphy, Director, Division of Enforcement
and Litigation
Leah Ippolito, Supervisory Attorney
Brett Ruff, Trial Attorney
Rosalee Thomas, Trial Attorney

Complaint Counsel
Office of Compliance and Field Operations
U.S. Consumer Product Safety Commission
Bethesda, MD 20814
Tel: (301) 504-7809

2

## CERTIFICATE OF SERVICE

I hereby certify that on February 10, 2022, I served the foregoing Complaint and List and Summary of Documentary Evidence upon all parties of record in these proceedings by delivering them in person to the following individual:

*James A. Leach*

Leachco, Inc.
130 E 10th Street
Ada, OK 74820

*Mark Brown*

Mark Brown
Product Safety Investigator
U.S. Consumer Product Safety Commission

**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION**
OFFICE OF THE CHIEF ADMINISTRATIVE LAW JUDGE
1331 PENNSYLVANIA AVE., N.W., SUITE 520N
WASHINGTON, DC 20004-1710
TELEPHONE: 202-434-9950
FAX: 202-434-9949

April 4, 2022

In the Matter of

LEACHCO, INC.,                                    CPSC Docket No. 22-1

        Respondent.

## ORDER SCHEDULING PREHEARING CONFERENCE

This proceeding commenced with the filing of a complaint on February 9, 2022. The complaint was published in the Federal Register on February 16, 2022. 87 Fed. Reg. 8,733, 8,804 (Feb. 16, 2022). An interagency agreement for the loan of my services to the Consumer Product Safety Commission was finalized on February 25, 2022. On March 17, 2022, the Chair of the CPSC appointed me as the presiding officer for this proceeding.

Under 16 C.F.R. § 1025.21, an initial prehearing conference shall be held within fifty days of the publication of the complaint in the Federal Register unless "unusual circumstances would render it impractical or valueless" to do so. Due to the timing of my appointment and the public notice requirement, holding a prehearing conference within fifty days of publication is impossible, and therefore impractical. A prehearing conference shall be held as follows:

        Date:             Friday, April 22, 2022

        Time:            1:00 p.m. Eastern Time

        Means:        Zoom [link provided to those listed in Distribution]

Before the prehearing conference, the parties must confer and discuss the issues listed in 16 C.F.R. § 1025.21(a)(1) through (14). The parties should also discuss a plan for discovery and whether there are issues as to preservation, retrieval, review, disclosure, or production of discoverable information, including issues as to the disclosure or discovery of electronically stored information. The parties should have prepared for the conference, a summary of their discussion as well as proposed procedures and deadlines. The parties should also report whether they have discussed settlement and, if so, whether they believe settlement is possible or likely.

The CPSC should arrange for a court reporter for the prehearing conference. I direct that notice of this conference be published in the Federal Register. 16 C.F.R. § 1025.21(b) (2022).

Michael G. Young
Administrative Law Judge

Distribution:

Leah Ippolito, U.S. Consumer Product Safety Commission, 4330 East West Highway, Bethesda, MD 20814, lippolito@cpsc.gov

Brett Ruff, U.S. Consumer Product Safety Commission, 4330 East West Highway, Bethesda, MD 20814, bruff@cpsc.gov

Rosalee Thomas, U.S. Consumer Product Safety Commission, 4330 East West Highway, Bethesda, MD 20814, rbthomas@cpsc.gov

Caitlin O'Donnell, U.S. Consumer Product Safety Commission, 4330 East West Highway, Bethesda, MD 20814, codonnell@cpsc.gov

Cheryl A. Falvey, Crowell & Moring LLP, 1001 Pennsylvania Avenue, NW, Washington, DC 20004, cfalvey@crowell.com

Bettina J. Strauss, Bryan Cave Leighton Paisner LLP, One Metropolitan Square, 211 North Broadway, Suite 3600, St. Louis, MO 63102, bjstrauss@bclplaw.com

Nina E. DiPadova, U.S. Consumer Product Safety Commission, 4330 East West Highway, Bethesda, MD 20814, ndipadova@cpsc.gov

Alberta E. Mills, U.S. Consumer Product Safety Commission, 4330 East West Highway, Bethesda, MD 20814, amills@cpsc.gov